| | | |
|---|---|---|
| **JOE ULE,** Individually and as Personal Representative of the Estate of **JACK ULE,** decedent**,** | § § § | |
| Plaintiffs, | § | **CAUSE NO.:** 19 CV 1459 |
| | § | |
| **V.** | § | |
| | § | |
| **BEXAR COUNTY, SHERIFF JAVIER SALAZAR, and BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS,** | § § § | |
| Defendants | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOE ULE, Individually and as the Representative for the Estate of JACK ULE, decedent, complaining of and about BEXAR COUNTY, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, and BEXAR COUNTY, SHERIFF JAVIER SALAZAR, and "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALAZAR, and for cause of action shows unto the Court the following:

### I.     INTRODUCTION

1.      This case arises from the callous treatment of Jack Ule, 63-year-old uninsured homeless man with chronic and severe mental illness, including bipolar disorder and

1

schizophrenia, as well as worsening heart disease. Jack was seen at UHS numerous times in the months preceding his death for which his mental illness and ill health were documented, but inadequately treated. Records of his visits demonstrate that Jack was subjected to substandard care and discrimination, because he was homeless, uninsured, and mentally ill.

2. UHS states that "The mission of University Health System is to improve the good health of the community through high quality compassionate patient care, innovation, education and discovery."[1] Unfortunately, the UHS medical professionals upon whom Jack relied saw him as a mentally ill, uninsured homeless man who was over-utilizing healthcare services and exhibiting behavioral problems that failed to warrant medical attention. Jack Ule was discriminated to death! The care Jack received from UHS was lacking in both quality and compassion, and invites questions, such as:

- What did UHS do to improve Jack Ule's health?

- What high quality patient care did UHS provide to Jack Ule at the main facility and Jail?

- What high quality compassionate care did UHS provide to Jack Ule at the main facility and Jail?

- Was Jack Ule's patient care attentive as stated in UHS Mission statement?

- Was UHS patient care of Jack Ule kind and helpful without exception?

- Does UHS's failure to Jack Ule of the above five points make UHS a most trusted institution?

3. Incredibly, on April 4, 2019, Jack was arrested for trespass by the same hospital

---

[1] https://www.universityhealthsystem.com/about-us/mission-vision-and-values (last visited 12.12.19)

entity, which hours prior had prematurely pushed Jack out of the Emergency Department. Jack was nonviolent in all prior encounters with the hospital entity. It is inexplicable that Jack was arrested, rather than escorted off the property. Further, despite his documented mental health history, Jack was incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

4.     The Adult Detention Center states that its "MISSION & PURPOSE" is:

- To deliver detention services and operations necessary for the protection of society, provide a safe environment to the staff working in the building, and maintain the proper well-being of incarcerated persons.

- To provide an environment for incarcerated persons in which correction of behavior is possible if the individual so desires. Such an environment shall include the protection of the incarcerated person from victimization within the facility.

- To provide an environment for incarcerated persons that maintains the appropriate due process and internal legality necessary to protect an individual's constitutional rights.

- To return the offender to society in a condition (physically, mentally, or any other manner) no worse than when the prisoner came into the facility.

- To provide the courts, upon request, with information to and in sentencing decision.

- To provide the necessary levels of security, appropriate detainee classification, and staff training to safely accomplish the preceding objectives.[2]

5.     Sadly, the Adult Detention Center fell woefully short of fulfilling its mission and purpose with respect to its treatment of Jack. In particular, Jack was jailed for a nonviolent misdemeanor, and could not afford nominal bond – in his case just $500. As a result, Jack remained incarcerated. While incarcerated, Jack continued to receive substandard care both for his mental illness and physical illness (heart disease). In fact, in the twenty-four hours prior to his death officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting

---

[2] https://www.bexar.org/749/Adult-Detention-Center-Facility (last visited 12.12.19)

aberrant lack of bowel control, shortness of breath, and confusion. Jack's needs were minimized dismissed, and/or ignored. Jack died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.

## II.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims raised in this Complaint under 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the United States Constitution.

7.      Venue is appropriate in the Western District of Texas under 28 U.S.C. § 1391 as Defendants are residents of the Western District of Texas, and the acts complained of arose in the Western District of Texas.

## III.    PARTIES AND SERVICE

8.      Plaintiff JOE ULE ("Joe" or "Plaintiff"), is an individual and brings this suit on behalf of himself and as the personal representative of the Estate of JACK ULE ("Jack" or "Plaintiff-Decedent"), who is deceased. Joe is Jack's surviving brother. Joe and Jack collectively may be referred to as "Plaintiffs."

9.      Defendant BEXAR COUNTY is a municipal corporation organized under the laws of the State of Texas.[3] The Bexar County Sheriff's Department is a division of Bexar County and operates the Bexar County Jail. Bexar County may be served with process by serving Nelson Wolff as County Judge of Bexar County, at 101 W. Nueva, 10th floor, San Antonio, Texas, 78205. In addition, service of Bexar County can be effected by personal delivery.

---

[3]      "A municipality is liable under this chapter for damages arising from its governmental functions, which are those functions that are enjoined on a municipality by law and given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." Tex. Civ. Prac. & Rem. § 101.0215.

10.    Defendant SHERIFF JAVIER SALAZAR ("Sheriff Salazar") is named officially and individually, and may be served with process at 200 N Comal, San Antonio, Texas, 78207. At all times relevant to this cause, Sheriff Salazar was operating in the course and scope of his agency and/or employment relationship with the Bexar County Sheriff's Office. Under Tex. Local Gov't Code § 351.041 and Tex. Code Crim. Proc. Art. 16.21, the Sheriff is responsible for those incarcerated at his jail and is "the keeper of the county jail," "shall safely keep all prisoners committed to the jail," and "shall continue to exercise supervision and control over the jail." It is Sheriff Salazar's responsibility to hold detainees in a manner consistent with his oath to uphold both the Texas and United States Constitutions.[4] It is Sheriff Salazar's responsibility to hold detainees in a manner consistent with his oath to uphold both the Texas and United States Constitutions. The Sheriff of a county serves as the jail administrator any time there is a not a person available who satisfies the examination requirements set forth in Tex. Gov't Code, § 511.00905 and "if there is a vacancy … the sheriff shall serve as administrator of the jail until a new administrator is appointed and assumes the position."[5]

11.    BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEM ("UHS"), may be served with process by serving Dr. Dianna M. Burns-Banks (Secretary of the Board) at 1954 E. Houston, San Antonio, Texas, 78202. In addition, service of UHS may be effected by personal delivery. UHS is a political subdivision of the state of Texas, and a public health system created in 1955 to provide medical care to the indigent of Bexar County. The Texas Supreme Court has held that county hospital districts are political subdivisions of the State authorized by the Texas Legislature to "provide for the establishment of a hospital or hospital system to

---

[4] *See ODonnell v. Harris County*, 892 F.3d 147, 157 (5th Cir. 2018).
[5] Tex. Local Gov't Code, § 351.034(d).

furnish medical aid and hospital care to indigent and needy persons residing in the district."[6] The Adult Detention Center at issue states that primary care services are provided by UHS, including medical staff, on-site services, clinic, pharmacy, and in-patient care.[7] Pursuant to this Court's holding in *Rodriguez v. Bexar Cnty.,* entities must be separated for purposed of determining liability: "Bexar County and Bexar County Hospital District d/b/a University Health System ("UHS") are distinct legal entities. Therefore, it must ultimately be determined which entity employed each individual Defendant."[8]

## IV. FACTUAL ALLEGATIONS

### Mental Illness Altered Jack's Trajectory in Life

12.     Jack Ule grew up no different than your average American kid who dreams of a bright future. Jack had three siblings, and great up in Cleveland, Ohio.

13.     Jack was a straight A student. He attended John Carroll University for two years, where he played on the baseball team. Jack then went to Ohio State, where he received degrees in both Agronomy and Business. Jack paid for his entire education by working at restaurants in the area; he never took out loans.

[This page intentionally left short.]

---

[6] *See Rodriguez v. Bexar Cnty.*, Civil Action No. SA-18-CV-248-XR, 2018 U.S. Dist. LEXIS 157585 at *3 (W.D. Tex. Sept. 17, 2018) ("The Texas Supreme Court has held that county hospital districts are political subdivisions of the State authorized by the Texas Legislature to 'provide for the establishment of a hospital or hospital system to furnish medical aid and hospital care to indigent and needy persons residing in the district.'" (quoting *Klein v. Hernandez*, 315 S.W.3d 1, 7 (Tex. 2010) (quoting Tex. Health & Safety Code § 281.002(a)).
[7] https://www.bexar.org/737/Medical-Services (last visited 12.12.19).
[8] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *3.



Jack as a school boy age 10 (circa 1966).

      14.      Jack was a great Uncle to his brother Joe's sons, Joey and Steven, and his sister,

Peggy's sons, Kevin and Dennis, with whom he spent lots of time as they were growing up.


[This page intentionally left short.]



Jack with one of his nephews (circa 1980).

15.     Unfortunately, in late twenties, Jack's mental state began to deteriorate. He returned to Cleveland, OH to live with mother, and continued working until year 2000.  At this time, against Jack's wishes, he began to receive disability income, because he was unable to work due to mental illness.

16.     Jack did his best to take care of mother, Sylvia, until her death in 2015.

[This page intentionally left short.]



Jack with his mother, Sylvia, and his great-niece, Daphne.

17.    After Sylvia's death, Jack drifted.  Jack always wanted to live in El Paso, Texas, but got stuck in San Antonio.

18.    Homelessness and mental illness profoundly affected the reality of Jack's adult life versus his childhood dreams and potential as a young man.  This new path, however, was not meant to end alone in a jail cell suffering and gasping for his last breath.

19.    At the time of him death, Jack was a pretrial detainee for constitutional purposes.

20.    Jack has suffered for decades from known mental illness. Due to his mental illness, he was unable to work, which left him homeless and uninsured.

21.    Many homeless adults suffer from chronic and severe mental illness. The visibility of mentally ill people has led to the creation of a stereotype for the entire homeless population; the

earlier stereotype of the homeless alcoholic has been replaced in recent years with that of the mentally ill homeless person.[9]

22.      The handling of Jack's care acutely demonstrates the pervasive biases existing in the healthcare system.  In particular, there is implicit bias, which refers to the attitudes or stereotypes that affect our understanding, actions, and decisions in an unconscious manner.[10]  Significantly, extensive evidence and research has found that unconscious biases can lead to differential treatment of patients by race, gender, weight, age, language, income and insurance status.[11]

23.      Jack was not only homeless and uninsured, but also suffering from mental illness. As such, Jack was particularly vulnerable to differential treatment as a pretrial detainee.

### February 7, 2019

24.      On February 7, 2019, Jack enrolled into UHS for his first admission to date.

25.      On that date, Jack was diagnosed with Chronic Mental Illness code F99 by Vicki L. Hubbard, M.D. ("Dr. Hubbard").  Dr. Hubbard provided no rationale for the Chronic Mental Illness diagnosis in medical records during the visit (1081-1108). Dr. Hubbard's only other documentation regarding Mental Health was within "Physical Exam Findings," in which Jack's psychiatric status was described as "appropriate affect" (1105).

26.      Throughout the February 7, 2019, medical records, Jack was documented as UNINSURED, OVERWEIGHT, and HOMELESS (1103-1107).  Being overweight is another

---

[9] National Center for Biotechnology Information, *Homelessness, Health, and Human Needs* (Institute of Medicine (US) Committee on Health Care for Homeless People) at https://www.ncbi.nlm.nih.gov/books/NBK218236/ (last visited on 12.12.19).

[10] Medical Group Management Association, "Implicit bias: the importance of self-awareness for patient care and in the workplace," at https://www.mgma.com/data/data-stories/implicit-bias-the-importance-of-self-awareness-fo (last visited 12.12.19).

[11] National Center for Biotechnology Information, *Implicit bias in healthcare professionals: a systemic review* (Chloe FitzGerald; Samia Hurst), at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5333436/ (last visited 12.12.19).

characteristic which can mark a health care patient for discriminatory treatment and substandard medical care.[12]

27.     Dr. Hubbard discovered a new onset of Atrial Flutter with frequent falls, tachycardia, fatigue on exertion, and swelling in lower extremities – all symptoms consistent with heart disease; however, no cardiac enzyme tests, no electrocardiogram, or echocardiogram were performed.

28.     Instead, Jack was discharged the same day.

**February 19, 2019**

29.     On or about February 19, 2019, UHS Officer Amy Ximenez arrived at University Hospital, and stated in her report:

> On arrival Officers made contact with PCC Chris Poore RN., who stated:
>
> Patient Jack Ule has been discharged and is refusing to get up and out of the bed. Ule was refusing all medical services and was not letting medical staff complete the plan of care for him. Ule was advised he would be discharged. Officers would continue to stand-by at the request of PCC Poore.
>
> PCC Poore stated he would find Mr. Ule some clothes and offer him a bus pass, after Mr. Ule received clothing items he dressed and was escorted out of the hospital's main entrance without incident.

*See* composite Exhibit A at 31-32 (UHS Incident # 19-000635).

**February 22, 2019**

30.     On or about February 22, 2019, UHS Officer Barry Holmes, arrived at University Hospital, and stated in his report:

> Upon arrival contact was made with Nurse PCC Amanda Rey who stated her patient, whom she identified as Jack Ule, is a regular patient, currently, registered, with a serious medical condition to his

---

[12] *See* notes 10-11, *supra*.

groin and while she is mindful of Ule's serious condition, she has spoken to Ule and warned him to cease touching/scratching himself, in public, and in a manner that others at this facility may find inappropriate and/or offensive.

Contact was made with Ule who stated he is suffering with a lot of pain and discomfort from his cancer and was scratching himself, over his pants, in an effort to reduce the discomfort. I advised Ule that others could easily interpret the actions as inappropriate. I observed several people in the waiting area; no complaints against Ule were noted.

*See* composite Exhibit A at 24-25 (UHS Incident # 19-000683).

31.     On or about February 22, 2019, UHS Officer David Hapney, arrived at University Hospital, and stated in his report:

Upon making location, I contacted Cafeteria Supervisor R. Rambojun who requested I ask discharged patient J. Ule to leave the cafeteria,. Rambojun reported Ule had not made a purchase and was making customers uncomfortable with his scratching and ·odd behavior. Rambojun also reported he was told Ule has an infectious medical condition (scabies).

I contacted Ule and informed him he was discharged and had no further business at UH. I escorted Ule to the Sky Tower 1st floor Main Entrance and off the premises.

*See* composite Exhibit A at 27-28 (UHS Incident # 19-000670).

32.     On February 23, 2019, Officer Hapney then added a supplement to the report, which stated:

Upon making location, I observed patient J. Ule asleep with his head lying on a table.  I contacted Ule concerning his patient status. Ule reported he was currently registered as a patient In the Emergency Department.

I escorted Ule to the Emergency Department waiting area and confirmed his patient status with medical staff. I informed Ule to remain in the waiting area until he was called or he would be removed from the system and have to re-register. I also informed Ule not to return to the cafeteria unless he was making a purchase.

*See* composite Exhibit A at 29 (UHS Incident # 19-000670).

## March 13, 2019

33.     On or about March 13, 2019, another report UHS# Incident #19-000897, UHS employee Rushing-Uribe called to report to have Jack removed because Jack was talking to himself and loitering in the cafeteria.  It was discovered Jack had a have a medical wrist-band, so he was escorted back to the Emergency Center.  *See* composite Exhibit A at 20-22 (UHS Incident # 19-000897).

## March 18, 2019 – Jack is Admitted and Discharged

34.     On or about March 18, 2019, Physician Assistant William Morris ("PA Morris") made first contact with Jack at 02:27 and ended session at 02:30 per Garrett Frazier (Scribe) sign-off (0487-0490).   Morris documented the following:

- "… patient has been seen here multiple times for the same complaint" (0487); and
- "The patient has been medically screened within the limited time and resources available to do so and it has been determined that no clinically apparent life of limb threatening condition currently exists." (0490)

35.     Based on the timeline noted, PA Morris made his determination within just three minutes.  As indicated by PA Morris' note, Jack was subjected to discrimination by healthcare providers, who saw Jack as a homeless, uninsured, mentally ill patient that was overutilizing services.

36.     On March 18, 2019 at 08:51, Brian Parker, M.D. ("Dr. Parker") noted in HPI: (Jack Ule) reports BLE swelling, but states, 'this is because I always lay down flat.' Of note, patient states that he does not take medication at home 'because I do not need them.' States that 'I do not take Lasix at home because it would not be effective.'

13

37.     In addition, Dr. Parker later stated "(JACK ULE) has capacity to make medical decisions currently (0495-0496)."

38.     Jack was discharged that same day at 10:15.

**March 19, 2019 – Jack Receives Trespass Warning**

39.     On March 19, 2019, at 2:28, Jack received a written criminal trespass warning for loitering and causing disturbance with staff. *See* composite Exhibit A at 2-3 and 14-19 (UHS Incident # 19-000992).

**March 21, 2019 – Jack is Admitted**

40.     On or about March 21, 2019, Jack was admitted for hypervolemia due to acute heart failure exacerbation.

41.     Jack remained hospitalized until March 28, 2019 for exacerbation (0311).

**March 28, 2019 – Jack is Discharged**

42.     On or about, March 28, 2019, UHS Officer Miguel Trevino ("Officer Trevino") was called to the UHS clinic, because Jack would not allow medical staff to remove the IV from his arm and kept denying access. Jack also complained about not having shoes, and said that he was not leaving without shoes. The RN started Jack arrived without shoes, and they were willing to provide him with disposable foot covers as a resolution for his complaint. Jack then was escorted out of the main entrance of the hospital. *See* composite Exhibit A at 11-13 (UHS Incident # 19-001123).

**April 3, 2019 – Jack is Admitted and Discharged**

43.     Per UHS records, Jack was admitted on April 3, 2019, with a chief complaint of CP (Chest Pain) and SOB (Shortness of Breath).

44.     UHS performed a chest x-ray. Jack's chest x-ray showed a difference in findings

from that of March 21, 2019. In particular, cardiomegaly, pulmonary vascular congestion, and interstitial pulmonary edema were found on the April 3 chest x-ray, as opposed to that of March 21 where Jack's pulmonary vasculature was within normal limits and no cardiomegaly was identified.  While the physician stated no evidence of decomposition, cardiomegaly is known to increase risk of heart failure, and these new signs of pulmonary vascular congestion and edema indicated that Jack's congestive heart failure was worsening.

46. In addition, in most cases heart problems are the root cause of pulmonary edema/ Jack recently was seen for volume overload, and it appears based on CXR findings that fluid is once again accumulating. This also could explain Jack's shortness of breath.

46. Despite Jack's check x-ray, cardiac history, and last known ejection fraction of 34%, UHS failed to perform an echocardiogram.  An echocardiogram would have shown if Jack's heart failure had worsened.

47. UHS did perform an electrocardiogram (aka "EKG" or "ECG") test, for which the results were abnormal.  In particular, there was left atrial enlargement, QTC 463. In other words, Jack's heart was enlarged.  The EKG also showed a long QT, which in an interval that can cause dangerous arrhythmias.  Based on these results, there should have been significant concern for Jack's heart, and an immediate discharge was wildly inappropriate.  Instead, UHS should have ordered additional EKG monitoring and electrolyte testing.

48. Again, the timeline of Jack's care on April 3 shows that he was quickly discharged. For example, Jack arrived at 07:40, but was not seen by any provider until 12:31.   Jack then received the chest x-ray an EKG, but despite the ominous results of both, Jack was discharged shortly thereafter without any additional EKG monitoring or lab screening.

49. Based on Jack's April 3 admission, Jack was not treated appropriately, and UHS

wrongfully discharged Jack too soon.  Jack's chief complaint upon admission on April 3 was chest pain and shortness of breath. Yet, Jack's discharge notes continue to describe him as having dyspnea on exertion, which is the medical term utilized for shortness of breath.  Therefore, Jack was not treated for one of his chief complaints.

<strong>April 4, 2019 – Jack is Arrested Shortly After Midnight</strong>

50.     On or about April 4, 2019, UHS Defendant employee Bexar County Hospital District Police Officer EDWIN BELL("Officer Bell") was a licensed Texas Peace Officer employed by the Bexar County Hospital District.   *See* composite Exhibit A at 5-9 (UHS Incident # 19-001197).

51.     Bexar County Hospital Police Department Ambassador Mike Betancourt #4134 ("Ambassador Betancourt") called Officer Bell, and stated that he observed Jack watching television in an <u>unoccupied</u> waiting area.

52.     Upon his arrival, Officer Bell observed Jack watching television in an <u>unoccupied</u> waiting area at 8 minutes past midnight.  Significantly, there was no one around, and Jack was not bothering anyone.  Jack was committing no crime, other than the offense of his existence.  *Id.*

53.     Jack told Officer Bell that he had just been discharged that day from the emergency center, but wanted to rest and watch television. Officer Bell then informed Jack that watching television and loitering at the hospital were not permitted.

54.     At 12:08 am (eight minutes past midnight) on April 4, 2019, Officer Bell detained Jack, and escorted him to Pod 4, holding cell #4, to the Behavioral Detainee Side of the UHS facility.

55.     In UHS Incident #19-001197, Officer Bell wrote, "Subject detained and escorted to Behavioral Health Detainee Side, subject has an active Criminal Trespass Warning." Officer

Bell placed Jack in handcuffs and transported him to jail to be booked for criminal trespassing, a class B misdemeanor, rather than process him for Warrantless Emergency Mental Health Detention, despite knowing Jack had a mental health condition. *See* composite Exhibit A at 5-9.

56. Significantly, there was no warrant or warning incident to Jack's arrest just after midnight on April 4. In fact, there was no reason for Officer Bell to arrest Jack.

57. At the time of Jack's arrest, Officer Bell knew that Jack recently had been discharged from the UHS Emergency Center.

58. At the time of Jack's arrest, Officer Bell also knew that Jack had been linked to previous criminal warnings at UHS without any violence or property being damaged. For example, the UHS# Incident #19-000897 regarding Jack's wandering around and talking to himself in the cafeteria would have been on file. Talking to one's self is recognized as "responding to internal stimuli," a classic symptom of Schizophrenia. Officer Bell should have seen the report for UHS# Incident #19-000897 in the file, and determined that Jack belonged in Emergency Mental Health Detention.

59. In accordance with Health and Safety Code 571.004, a mentally ill person, with which Jack's history clearly coincides, should be place in the LEAST RESTRICTIVE APPROPRIATE SETTING. The least restrictive appropriate setting for the treatment of a mentally ill person like Jack is the treatment setting that:

- is available; (there are multiple psychiatric hospitals that would have admitted Jack based on his history)

- provides Jack with the greatest probability of improvement or cure; and

- is no more restrictive of Jack's physical or social liberties than is necessary to provide Jack with the most effective treatment and to protect adequately against

any danger Jack poses to himself or others.

60. Incredibly, Jack was arrested by the same entity, UHS, which hours prior had prematurely pushed Jack out of the Emergency Department and failed to treat him. In all UHS reports, Jack was nonviolent and always left without incident. It is inexplicable that Officer Bell chose to arrest Jack rather than escort him off the property.

61. Moreover, despite exhibiting behavior consistent with mental illness, Jack was arrested, processed, and jailed for an allegation of criminal trespass onto private property, a Class B misdemeanor, punishable under Texas law by a fine not to exceed $2,000, a maximum of six (6) months in jail, or both such fine and confinement.

62. Jack was booked on April 4, 2019 at 00:08 a.m. Jack was processed and jailed at the Bexar County Jail by an "unknown" jail administrator.

63. Medical Screening was performed at 06:08 a.m. on April 4. Medical screening supported Jack's diagnoses of Bipolar 1 and Schizophrenia, both of which are considered a serious mental illness.

64. At 09:16 a.m. on April 4, a mental health assessment was performed. During assessment, Jack admitted to being hospitalized multiple times (4-5) for mental illness-related issues and also admitted to taking Olanzapine (Zyprexa) at one point in his life, which is an antipsychotic, used in treatment of psychotic episodes. Jack also was described during mental health assessment as being delusional (grandiose), which is a symptom associated with Bipolar Disorder.

65. Notably, Jack's mental health status continued to be assessed followig his April 4 incarceration. Jack was observed as manic, irritable, and trouble getting to sleep, all of which are all symptoms of Bipolar Disorder. This observation, for example, was made four days after

booking and three days after beginning medical treatment with Olanzapine daily. Clearly, Jack was not improving and should have been transferred out of facility to a psychiatric hospital were he could receive specialty care.

### April 5, 2019 – Olanzapine Begins Despite Jack's Medical History

66.     Jack was prescribed Olanzapine, a well-known antipsychotic, on April 5 while in jail. Olanzapine has been researched thoroughly and found to have a direct correlation with "dilated cardiomyopathy." Ironically, the medical examiner listed this verbatim as a reason for Jack's death.

67.     Providers are cautioned about Olanzapine's association with cardiovascular issues, and to be sensitive to this when prescribing Olanzapine to someone with mental illness. A study conducted by Morisette found that Olanzapine possesses direct cardiac electrophysiological effects.

68.     In someone with Jack's history, Olanzapine should not have been used in medicinal treatment, or there should have, *AT LEAST*, been close cardiac monitoring of Jack.

69.     Jack had many risk factors that predisposed him for ill effects of Olanzapine:

- Age (63) - Studies state, "Especially in elderly, Olanzapine is associated with increased risk of cardiovascular disease."

- Diagnosis of Schizophrenia - Studies state, "Use with schizophrenia have an increased risk of sudden death and are 2–4 times more likely to die prematurely compared to the general population."

- Diagnosis of Atrial Fibrillation (untreated) and Hypertension (untreated) - Studies state, "Untreated Atrial Fibrillation puts you at a higher risk for heart failure." Another study states, "Longstanding hypertension ultimately leads to heart failure."

- Ejection fracture - Jack was recorded as having an ejection fraction of 35%-40%. Evidence shows "A normal ejection fraction is more than 55%. This means that 55% of the total blood in the left ventricle is pumped out with each heartbeat. **Heart failure with reduced ejection fraction** happens when the muscle of the left ventricle is not pumping as well as normal. The ejection fraction is 40% or less." Thus, Jack technically was in heart failure.

- Elevated QTC - As noted on the only EKG reading from April 3, Jack's QTC was >450, which constitutes close monitoring, especially when prescribed an antipsychotic like Olanzapine. Why? Because Olanzapine is known to elongate QTC wave even more.

70.     The Jail never performed an EKG to monitor Jack's heart function, yet continued to administer Olanzapine, which is known to have a direct correlation with cardiomyopathy. Given Jack's risk factors for heart disease, the provider should have refrained from prescribing Olanzapine, or at least monitored Jack's heart function.

**April 9, 2019 – Jack Signs Refusal of Medical Services**

71.     On April 9, 2019, a UHS employee permitted Jack to sign a refusal of medical services even though Jack had only received two nonconsecutive doses of Olanzapine. Based on this prior treatment at UHS, it took five consecutive doses of Olanzapine for medical staff to see an improvement in Jack's mental health symptoms.

72.     Jack did not even receive proper psychiatric treatment to constitute capacity to refuse, nor was his capacity to refuse assessed or documented by a medical provider. At the same time, however, Jack's judgment and insight was noted to be impaired and limited. Further, less than a month prior between March 22 through March 27, seven (7) UHS physicians found Jack

lacked the capacity to refuse treatment.

## April 17-18, 2019 – Jack's Complaints are Dismissed and He Dies

73.     The critical events regarding Jack's care – or lack thereof – leading to his death occurred between April 17, 2019 at 6:31 a.m. to April 18, 2019 at 8:40 a.m. (Jack's time of death).

74.     The following events were documented by John A. LaFauci, LVN ("Mr. LaFauci"), a UHS medical staff member at the Bexar County Jail. Significantly, while Mr. LaFauci documented some of the information contemporaneously, he added additional three weeks later on May 9, 2019.[13]  The events described by Mr. LaFauci raise grave concern about the medical neglect and discrimination to which Jack was subjected in his final, most vulnerable hours.

75.     On or about April 17, 2019 @ 06:31 – The first Code 1 (Medical Emergency) was called in regard to Jack's complaint of Shortness of Breath ("SOB"). It was severe enough that Jack was transported via wheelchair to be assessed by Mr. LaFauci.  Mr. LaFauci dismissed the SOB based on the results of objective data (Vital Signs within normal limits) and noted that Jack had had the same complaint of SOB over the past 2 months, even though this is unsupported by the documentation.  In particular, Jack's last complaint of SOB occurred just 7 days prior. Mr. LaFauci's characterization of Jack's SOB complaint as "continuous" minimizes the significance of Jack's complaint.  Mr. LaFauci then put in a plan for Mental Health ("MH") and had Jack returned to the pod.  In all, Mr. LaFauci spent less then 7 minutes assessing Jack.

76.     On or about April 17, 2019 @ 20:30- 2nd shift BK unit officer called Mr. LaFauci (who had returned at this time for a consecutive night shift) to relay Jack's request to see medical. Mr. LaFauci failed to examine Jack, speak to Jack, or otherwise lay eyes on Jack.

---

[13] The Bexar County Hospital District Police Department printed police reports regarding Jack on April 22, 2019, in response to counsel's records request.

77. On or about April 17, 2019, @ 21:00 – BK officer contacted Mr. LaFauci once again to inform him of Jack Ule defecating and urinating on himself. Mr. LaFauci described these actions as "not a medical emergency." Per UHS documentation, however, Jack's bowel and bladder incontinence had not occurred prior to this instance either at UHS or while incarcerated at Bexar County Jail. An abnormal incident such as this constitutes further investigation by the healthcare provider, particularly as bowel and bladder incontinence have been considered sign of medical distress[14] and even impending death.[15]

78. On or about April 17, 2019, @ 23:30 – 3rd shift BK officer called about Jack's disruptive behavior once again. EMT Ferrero relayed this to Mr. LaFauci who, instead of assessing Jack, went to see mental health counselor, Diane. Without any research into Jack's records, the two agreed that Jack's actions were behavioral. Behavioral actions refer to a pattern of behaviors in a person. This is an incorrect inference when considering that Jack's physical conditions, the problem of bowel and bladder incontinence, had never occurred before.

79. On or about April 18, 2019, @ 00:30 – BK officer told Mr. LaFauci of his concerns that Jack was not able to dress himself or urinate, and believed it to be because of hernia, but he also stated he was not medical. BK officer also stated that Jack continued to disrupt other inmates, and BK Officer was worried for Jack's safety. This was the fourth concern relayed to the nurse, Mr. LaFauci, over the course of 4 hours from officers who were concerned about Jack's health and behavior. Officers described Jack's behavior as "disruptive," which could be both a symptom of

---

[14] *See, e.g.,* "Overactive Bladder is a Distress Symptom in Heart Failure" (Youn-Jung Son and Bo Eun Kwon) at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6059908/ (last visited 12.12.19).
[15] *See* Hospice Patient Alliance, "Signs and Symptoms of Impending Death," at https://www.hospicepatients.org/hospic60.html (last visited on 12.12.19).

Jack's untreated mental illness and a sign of impending death.[16]

80.     After listening to BK officer's concerns, Mr. LaFauci finally decided to assess Jack's status. When questioning Jack, his responses were nonsensical. For instance, when asked by Mr. LaFauci, "What's going on?" Jack stated, "Nothing but it's time for me to get my IV Colace." Jack then rambled some more, mentioned Colace once again, and then returned to his cell as if Mr. LaFauci was not even there. Jack's discussion of Colace was particularly odd as he was not even prescribed Colace. As such, Jack's reference to Colace indicates confusion, which is another harbinger that death is near. People can become agitated and disruptive, as well as disoriented and confused about where they are.

81.     There is no explanation for Mr. LaFauci's failure to assess Jack's mental status, which might have indicated an altered mental status and triggered interventions that might have prevented Jack's death.

82.     Instead, Mr. LaFauci made sure to reiterate to the officer that this was a detention issue, despite Jack's medical needs. In response, the officer agreed and stated that detention would handle it, and Mr. LaFauci could leave. Oddly, this record notation was not entered contemporaneously, but rather entered by Mr. LaFauci 21 days after Jack's death.

83.     The quality of care provided by Mr. LaFauci comes into question after reading his account of the events that occurred leading up to Jack's death, from dismissing Jack's SOB complaint to avoiding a proper assessment of Jack, even when officers stated their concerns four different times. It is evident that Mr. LaFauci had no concern for Jack's situation, and instead, dismissed Jack's abnormal symptoms and actions as "behavioral." Mr. LaFauci's lack of attention and care ultimately lead to Jack's death.

_____

[16] *Id.*

23

84.     Jack was found non-responsive in his cell, and pronounced dead on April 18 at 08:40.

**April 19, 2019 – Jack's Autopsy Reveals his Suffering**

85.     When Jack was arrested on April 4 and incarcerated, he was weighed and found to be 187.3 pounds. [17]   This intake weigh was the only weight documented by the jail.  On April 19, 2019 at 08:50, an autopsy was performed on Jack.  At autopsy, Jack's weight was 217 pounds – a gain of almost 30 pounds in less than two weeks.  This is a clear indication of the acute worsening heart failure that Jack was suffering.

86.     Further, the autopsy found "No inguinal hernia identified, though there is clear fluid within the scrotal sac as well as induration appreciated externally and on palpation within the canals."  This supports a claim of negligence and discrimination, because had Mr. LaFauci performed a physical examination on Jack, then he would have observed and palpated, a large amount of edema in the scrotal sac, a sign consistent with worsening heart failure.  Instead, Mr. LaFauci's documentation states "I told the SGT and officer that he has been living with that hernia for a long time and that his not dressing, pooping/urinating on himself is a behavioral issue."

87.     The autopsy also indicated prominent congestion and edema throughout Jack's lungs, thus supporting Jack's persistent complaint of shortness of breath.

88.     In addition, Jack's heart weighed 690 g with mixed cardiomyopathy, which is twice the average size of a normal heart.  In fact, the Autopsy Report states "After review of autopsy findings and available investigative information, it is our opinion that the decedent, Jack Ule, a 63-year-old male, died as a result of a hypertrophic and dilated cardiomyopathy."  In other words,

---

[17] In UHS police reports from February and March 2019, Jack is described as "130" and "140" pounds.  *See* Exhibit A.

Jack's heart was enlarged and could no longer pump the amount of blood necessary to sustain life. Jack has heart failure, which went untreated for an extended period of time; on top of which, Jack received, Olanzapine, a drug with evidence-supported correlation to dilated cardiomyopathy. Based on these findings, Jack's death was preventable.

**The Law Requires Competent Care for an Inmate's Mental and Physical Health**

89.     The 85th Legislature, amended Acts 2017, chapter 748 and chapter 950 (S.B. 1849) relative to the Tex. Code Crim. Proc. Art. 17.032 - "Release on personal bond of certain defendants with mental illness or intellectual disability." These changes directly illustrate the pretrial recommendations and magistration process of mentally ill defendants.

90.     The Texas Commission on Jail Standards, through the Tex. Admin. Code, dictates the health services required for all Texas jails. Section 273.5 outlines the responsibilities and requirements of each Sheriff/operator in coordination with mental health officials for developing and implementing a mental disabilities/suicide prevention plan, including: training, identification, reviewing, screening, communication, housing, supervision, intervention and emergency treatment, and checking the mental health history and background of all inmates admitted.[18]

91.     By law, Defendants were required to "give prisoners the ability to access a mental health professional at the jail through a telemental health service 24 hours a day" and "give prisoners the ability to access a health professional at the jail or through a telehealth service 24 hours-a-day or, if a health professional is unavailable at the jail or through a telehealth service, provide for a prisoner to be transported to access a health professional." Tex. Gov't Code § 511.009(a)(23)(A-B).

[This page intentionally left short.]

---

[18] 37 Tex. Admin. Code § 273.5

## V. CLAIMS

### COUNT I - VIOLATIONS OF 42 U.S.C. § 1983 FOR DEPRIVATION OF CIVIL RIGHTS UNDER THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT AS TO DEFENDANTS BEXAR COUNTY AND SHERIFF SALAZAR

92.     Plaintiffs' reincorporate preceding paragraphs 1-91 as if stated fully herein.

93.     As a direct and proximate result of the foregoing facts,  Defendants BEXAR COUNTY and SHERIFF JAVIER SALAZAR  contrary to law and unreasonably deprived Plaintiff-Decedent Jack Ule of his privileges and immunities guaranteed by the Due Process and Equal Protection Clauses under the Fourteenth Amendment, as well as his rights under the Texas Constitution, in a willful and wanton fashion, and they were deliberately indifferent. Because of their indifference, they caused Jack to suffer immeasurable injury and death, which caused the general damages requested by Plaintiffs in an amount to be proven at trial.

94.     Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects, or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, **shall be liable to the party injured** in an action at law, suit in equity, or other proper proceeding for redress."

95.     The Fifth Circuit has explained that deliberate indifference means that "**it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights**." *Rhyne v. Henderson Cnty*., 973 F.2d 386, 392 (5th Cir. 1992) (emphasis added). Plaintiffs assert that all Defendants deliberately ignored existing policies or they did not adopt

policies required by Texas law to protect Plaintiff-Decedent Jack Ule while he was incarcerated in the Bexar County Jail, thereby creating *de facto* policies through customs of ignoring the law. Defendants' deliberate indifference to the serious medical needs of its detainees in the jail, like Plaintiff-Decedent Jack Ule, caused him to needlessly suffer and die. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights.**[19]

## A. DEFENDANTS BEXAR COUNTY AND SHERIFF SALAZAR VIOLATED PLAINTIFF-DECEDENT JACK ULE'S *FUNDAMENTAL RIGHT TO PRETRIAL LIBERTY* BY KEEPING HIM IN JAIL SOLELY BECAUSE *HE COULD NOT AFFORD TO PAY BAIL.*

96.　　The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person because of him inability to make a monetary payment. Additionally, The Texas constitution protects criminal defendants against unreasonable bail, specifically, "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses." Tex. Const. Art. I § 11.　Defendants  violated Plaintiff-Decedent Jack Ule's fundamental right to pretrial liberty by keeping him in jail because he could not afford to pay bail without any inquiry into him ability to pay.

97.　　Here, Plaintiff-Decedent Jack Ule's bail experience through Bexar County was similar to Harris County bail practices, where the Fifth Circuit found in the seminal *ODonnell v. Harris County* case that despite their "formal requirements, in practice, county procedures were dictated by an **unwritten custom and practice that was marred by gross inefficiencies, did not achieve any individualized assessment in setting bail, and was incompetent to do so**."[20] The Fifth Circuit concluded that "[t]he incarceration of those who cannot [pay money bail], without meaningful

---

[19] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) citing *Leathimman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added).
[20] *Id* (emphasis added).

consideration of other possible alternatives, infringes on both due process and equal protection requirements" and that **"because indigent misdemeanor arrestees were unable to pay secured bail, which, inter alia, resulted in a deprivation of their most basic liberty interests**."[21] The Court emphasized this point stating, "when the accused is indigent, setting a secured bail will, in most cases, have the same effect as a detention order. Accordingly, such decisions must reflect a careful weighing of the individualized factors set forth by both the state Code of Criminal Procedure and Local Rules."[22]

98.     Similar to Harris County, Bexar County's bail-setting procedures violate the equal protection clause of the Fourteenth Amendment because they **treat otherwise similarly situated misdemeanor arrestees differently based solely on their relative wealth**.[23] The *ODonnell* court put forth a practical summation of comparing similarly situated detainees:

> In sum, the essence of the district court's equal protection analysis can be boiled down to the following: take two misdemeanor arrestees who are identical in every way—same charge, same criminal backgrounds, same circumstances, etc.—except that one is wealthy and one is indigent. Applying the County's current custom and practice, with their lack of individualized assessment and mechanical application of the secured bail schedule, both arrestees would almost certainly receive identical secured bail amounts. One arrestee is able to post bond, and the other is not. As a result, the wealthy arrestee is less likely to plead guilty, more likely to receive a shorter sentence or be acquitted, and less likely to bear the social costs of incarceration. The poor arrestee, by contrast, must bear the brunt of all of these, simply because she has less money than his wealthy counterpart.[24]

The *ODonnell* court held that this violates the equal protection clause[25]

---

[21] *Id*. citing *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc) (emphasis added).
[22] *Id*. at 158.
[23] *Id* (emphasis added).
[24] *Id.*
[25] *Id.*

99.     The Fifth Circuit court further acknowledged in *ODonnell* that the cited Supreme Court cases applied to indigents who were already found guilty. But the Fifth Circuit court in *Rainwater* concluded that the distinction between post-conviction detention targeting indigents and pretrial detention targeting indigents is one without a difference.[26] They found that, regardless of its timing, "**imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible**."[27] The Fifth Circuit held in 1971 that the pretrial detainment of "unconvicted misdemeanants" was a "[p]unitive measure [… ] out of harmony with the presumption of innocence."[28]

100.    In Bexar County, it appears there is no standard bond schedule and bonds are assigned on an arbitrary basis, even though Bexar County Pretrial Services has policies and procedures in place to protect mentally ill and/or indigent arrestees. The circumstances of Plaintiff-Decedent Jack Ule's arrest, magistration, and pretrial incarceration for over five months run extremely similar to the issues the court found so repugnant about the Harris County bail system in *ODonnell*.

101.    In the aftermath of Plaintiff-Decedent Jack Ule's death on April 18, 2019, it appears Defendants BEXAR COUNTY, and Sheriff JAVIER SALAZAR, with Bexar County Pretrial Services, have done nothing to mitigate the multiple failures of their system. On April 18, 2019, Jack Michael Ule, suffering from mental illness, died while in jail for a nonviolent misdemeanor because he could not afford nominal bond, in his case $500.

102.    According to an article on May 4, 2019, the *San Antonio Express-News* likened his death to Plaintiff-Decedent Jack Ule:

---

[26] *Id.*
[27] *Id.* citing *Rainwater*, 572 F.2d at 1056 (citing *Williams and Tate*) (emphasis added).
[28] *Anderson v. Nosser*, 438 F.2d 183, 190 (5th Cir. 1971).

Tragically, this is all too familiar. The deaths were four months apart. The contours of Ule's death on April 18 mirror the December death of JACK ULE, another inmate in the Bexar County Jail. Both had schizophrenia diagnoses. Adults in their 60s, both were charged with criminal trespass and held on low bonds. For Ule, bond was $500. For Dotson-Stephens, it was $300. Neither received representation at their bail hearings, nor appropriate mental health treatment while languishing in jail. Their deaths were four months apart, but each is the same damning indictment of a broken system desperately in need of the very reforms Bexar County's judges continue to resist and reject. If Bexar County's judges had embraced bail reform for nonviolent misdemeanors, Ule would never have died in jail. If Bexar County's judges truly embraced public defender representation for all defendants at bail hearings, Ule's mental health issues may have been flagged, and again, he may never have ended up in jail. In jail, Ule joined a cadre of people charged with criminal trespass who couldn't make nominal bonds. According to data from the Bexar County Sheriff's Office, the week Ule died, 54 people were in jail for criminal trespass. Their bonds ranged from $100 to $2,000.[29]

103. This all too familiar tragedy demonstrates once again that Defendants BEXAR COUNTY, SHERIFF JAVIER SALAZAR, and BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, have a *de facto* **policy and practice of unconstitutionally incarcerating indigent, mentally ill arrestees**.

104. These cases clearly demonstrate that Plaintiff-Decedent Jack Ule's fundamental right to pretrial liberty was violated by keeping him in jail solely, because he could not afford to pay bail, without providing any inquiry into or findings concerning him ability to pay. Unfortunately for Plaintiff-Decedent JACK ULE, **he was presumed indigent, and him ongoing, untreated mental illness was exacerbated by his extended incarceration**.

105. Plaintiff-Decedent JACK ULE present claims do not run afoul of *ODonnell*.

---

[29] San Antonio Express News, "Another avoidable tragedy in the Bexar County jail", at https://www.mysanantonio.com/opinion/editorials/article/Anothim-avoidable-tragedy-in-the-Bexar-County-jail-13818158.php (last visited 12.12.19)

Because all named Defendants ignored mandatory procedures and Texas law, they are responsible for the violations of him constitutional rights. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights**.[30]

### B. DEFENDANTS BEXAR COUNTY and SHERIFF SALAZAR VIOLATED PLAINTIFF-DECEDENT'S *FUNDAMENTAL RIGHT TO PRETRIAL LIBERTY* BECAUSE OF HIS *PROLONGED AND UNCONSTITUTIONAL DETENTION.*

106. The Texas Constitution guarantees the rights of the accused in criminal prosecutions including, "no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment, otherwise than in the penitentiary."[31] Additionally, Art. I, § 10 was designed to prevent oppressive pretrial incarceration, minimize the anxiety and concern of an accused, and limit the possibility that a defense will be impaired.[32]

107. Courts have tended to construe an "**oppressive pretrial incarceration**" as a period of one year or more; however, Plaintiff-Decedent JACK ULE was a pretrial detainee, suffering from known mental illness, unable to pay $500 bail for more than two weeks, and subsequently died while awaiting medical attention – simply for an allegation of criminal trespass by the very people who were supposed to provide him medical treatment, a class B misdemeanor (punishable under Texas law by a fine not to exceed $2,000, a maximum of six (6) months in jail, or both such fine and confinement).[33]

---

[30] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) citing *Leathimman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added).
[31] Tex. Const. Art. I § 10
[32] *Comeaux v. State*, 413 S.W.3d 176 (Tex. App.—Beaumont 2013).
[33] Tex. Penal Code § 12.22

108.    In 2017, the Fifth Circuit in *Jauch v. Choctaw Cnty.* analyzed due process violations and fundamental unfairness issues because of arbitrary government actions in pretrial detainee prolonged detentions.[34] As with *Jauch*, Plaintiff-Decedent Jack Ule's right to procedural due process was directly impacted in that the Court stated **prolonged-detention cases rise to the level of a violation of a "protected interest-life, liberty, or property**."[35]

109.    As in *Jauch,* Defendant Sheriff Salazar is responsible for those incarcerated at his jail. In fact, **Texas statutes** clearly **place the responsibility with the sheriff by law**.[36] The *Jauch* court did not allow the sheriff time in to escape liability because as they explained, "Sheriff Halford is responsible for those incarcerated in his jail, Miss. Code Ann. § 19-25-69, and the capias did not require him to impose the unconstitutional detention policy. Moreover, in an analogous context, the Supreme Court of Mississippi has made clear the responsibility of county sheriffs to hold detainees in a manner consistent with their oaths to uphold the federal and state constitutions … "[37]

110.    Additionally, Defendants BEXAR COUNTY and SHERIFF JAVIER SALAZAR violated multiple sections of Article 17.032 of the Texas Code of Criminal Procedure, "**Release on personal bond of certain defendants with mental illness or intellectual disability**" by not releasing Plaintiff-Decedent Jack Ule on personal bond or requiring him to submit to outpatient or inpatient mental health treatment **as required**.[38]

---

[34] *Jauch v. Choctaw Cnty.*, 874 F.3d 425 (5th Cir. 2017).

[35] *Id*. (citing *Augustine v. Doe*, 740 F.2d 322, 327 (5th Cir. 1984)).

[36] The Sheriff is responsible for those incarcerated at his jail and is "the keeper of the county jail," "shall safely keep all prisoners committed to the jail," and "shall continue to exercise supervision and control over the jail." Tex. Local Gov't Code § 351.041. The Sheriff of a county serves as the jail administrator any time there is a not a person available who satisfies the examination requirements set forth in Tex. Gov't Code § 511.00905 and "if there is a vacancy … the sheriff shall serve as administrator of the jail until a new administrator is appointed and assumes the position." Tex. Local Gov't Code § 351.034(d).

[37] *Jauch v. Choctaw Cnty.*, 874 F.3d 425 (5th Cir. 2017).

[38] Tex. Code Crim. Proc. Art. 17.032(b-c)

111. Consistent with these legal obligations, the Adult Detention Center states that its "MISSION & PURPOSE" is:

- To deliver detention services and operations necessary for the protection of society, provide a safe environment to the staff working in the building, and maintain the proper well-being of incarcerated persons.

- To provide an environment for incarcerated persons in which correction of behavior is possible if the individual so desires. Such an environment shall include the protection of the incarcerated person from victimization within the facility.

- To provide an environment for incarcerated persons that maintains the appropriate due process and internal legality necessary to protect an individual's constitutional rights.

- To return the offender to society in a condition (physically, mentally, or any other manner) no worse than when the prisoner came into the facility.

- To provide the courts, upon request, with information to and in sentencing decision.

- To provide the necessary levels of security, appropriate detainee classification, and staff training to safely accomplish the preceding objectives.[39]

112. Plaintiffs assert that the totality of the circumstances here are sufficient to show Defendants denied Plaintiff-Decedent Jack Ule his fundamental right to liberty due to the fact he could not rationally assert his rights because of his mental illness. Defendants should have immediately investigated, evaluated, appointed counsel, and potentially released Jack in accordance with Texas law.

113. Because of the Defendants' failures, Plaintiffs and Plaintiff-Decedent suffered unnecessarily through Jack's incarceration and subsequent death. Had Defendants complied with mandatory departmental policies and procedures, regulations, and Texas law,[40] they would have

---

[39] *See* note 2, *supra*.
[40] *See* Tex. Local Gov't Code § 351.041; Tex. Gov't Code § 511.00905, § 511.009(a)(23)(A-B); Tex. Admin. Code, tit. 37, § 273.5, § 267.1(b)(3), § 273.4(a), § 273.5(a)(1), § 273.5(a)(5), § 275.1, § 275.2, § 275.7, § 285.1; and Tex. Code Crim. Proc. Art. 16.21, Art. 16.22, Art. 16.23, and Art. 17.032.

identified Plaintiff-Decedent's history of mental illness and presumably sought the physical and mental health treatment he desperately needed.

114.     The right at issue here was clearly established and its contours "sufficiently clear" that any reasonable official would understand that the Constitution forbids confining criminal defendants for a prolonged period prior to bringing them before a judge. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights**.[41]

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT PURSUANT TO 42 U.S.C. § 1983 AS TO ALL DEFENDANTS

115.     Plaintiffs' reincorporate preceding paragraphs 1-91 as if stated fully herein.

116.     This Court discussed at length the bifurcation of constitutional claims for pretrial detainees in *Rodriguez v. Bexar Cnty*.[42] "Courts considering constitutional challenges by pretrial detainees must begin by deciding whether to classify the challenge as an attack on a condition of confinement or an episodic act or omission."[43]

117.     This Court explained in the *Rodriguez* opinion that a "challenge to a condition of confinement" is "a challenge to general conditions, practices, rules, or restrictions of pretrial confinement, and the constitutional issue is whether the condition is reasonably related to a legitimate governmental objective." [44] Additionally, *Rodriguez* clarifies that "a plaintiff may assert a

---

[41] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)).

[42] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *3 (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)).

[43] *Id.*

[44] *Id.* (discussing *Estate of Henson v. Wichita Cnty.*, Tex., 795 F.3d 456, 462 (5th Cir. 2015)).

conditions-of-confinement claim based on injuries suffered as a result of not receiving proper medical attention if the plaintiff does not implicate the acts or omissions of individuals but rather the jail's system of providing medical care to inmates."[45]

**A. DEFENDANTS BEXAR COUNTY, SHERIFF SALAZAR, and UHS, VIOLATED PLAINTIFF-DECEDENT JACK ULE'S FOURTEENTH AMENDMENT *RIGHT TO MEDICAL CARE* WHILE HE WAS DETAINED AT BEXAR COUNTY JAIL.**

118.    "When a county takes custody of a prisoner, *it must provide health care for the prisoner,*" per TEX. CODE CRIM. P. art. 16.21; *see also* 37 TEX. ADMIN. CODE § 273 (Texas Commission on Jail Standards, Health Services).[46] The United States Supreme Court has held that a governmental entity's duty to provide medical care to inmates is constitutionally mandated. *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988).[47]

119.    A pretrial detainee who has not been convicted of a crime has a right under the Fourteenth Amendment to the United States Constitution to be protected from impermissible punishment, like the denial of or delay in providing necessary medical care. According to the *Fifth Circuit Pattern Jury Charges*, Plaintiffs must prove the constitutional violation occurred due to the existence of an identifiable or intended condition, policy, or practice of inadequate medical care and that the condition, policy, or practice was not reasonably related to a legitimate governmental objective.[48]

120.    The Fifth Circuit recognizes that a condition usually results from an explicit policy

---

[45] *Id.* (discussing *Estate of Henson v. Wichita Cnty.*, 795 F.3d at 463). *See also Montano v. Orange County*, 842 F.3d 865 (5th Cir. 2016).

[46] *Thomas v. Harris County*, 30 S.W.3d 51, 57 (Tex. App.—Houston [1st Dist.] 2000) (emphasis added).

[47] *Id.* (discussing *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988)).

[48] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016 citing *Shepherd v. Dallas County*, 591 F.3d 445, 455 (5th Cir. 2009) (approving jury charge).

or restriction, but a pattern may demonstrate an unstated or *de facto* policy.[49] This Court supported this in the *Rodriguez* opinion in that "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions **sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice**."[50]

121.     Here, Jack Ule, was a 63-year-old uninsured homeless man with chronic and severe mental illness, including bipolar disorder and schizophrenia, as well as worsening heart disease. Jack was seen at UHS numerous times in the months preceding his death for which his mental illness and ill health were documented, but inadequately treated.  Records of his visits demonstrate that Jack was subjected to substandard care and discrimination, because he was homeless, uninsured, and mentally ill.  Medical professionals upon whom Jack relied saw him as over-utilizing healthcare services and exhibiting behavioral problems that failed to warrant medical attention, amongst other things.

122.     Incredibly, on April 4, 2019, Jack was arrested for trespass by the same hospital entity, which hours prior had prematurely pushed Jack out of the Emergency Department. Jack was nonviolent in all prior encounters with the hospital entity.  It is inexplicable that Jack was arrested, rather than escorted off the property.  Further, despite his documented mental health history, Jack was incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

123.     Jack was jailed for a nonviolent misdemeanor, and could not afford nominal bond, in his case $500.  While incarcerated, Jack continued to receive substandard care both for his

---

[49] *Id.*
[50] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *5 (citing *Shepherd*, 591 F.3d at 452) (emphasis added).

mental illness and physical illness (heart disease). In fact, in the forty-eight hours prior to his death officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion. Jack's needs were minimized dismissed, and/or ignored. Jack died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.

124.    The indifference shown by failing to treat Jack, improperly medicating Jack, and failing to have Jack transferred to a less restrictive environment which could more adequately address his mental health needs is evidence in itself that the level of medical care provided generally by UHS Correctional Health Care Services at the Bexar County Jail was so inadequate that it resulted in a serious deprivation of Plaintiff-Decedent's basic human needs, and that the lack of care provided was not reasonably related to a legitimate governmental objective.[51]

125.    The Fifth Circuit recites in its *Pattern Jury Charges* that "pretrial detainees may not be entitled to the best medical care available or to the level of medical care that may be available to persons who are not detained or incarcerated, but a **facility must provide for a detainee's basic human needs**."[52] In a general context, "basic human needs" could be understood as food and shelter, but as discussed herein, Texas law clearly required Defendants to provide Plaintiff-Decedent Jack Ule with much more care. Defendants Bexar County, Sheriff Salazar, and UHS failed to meet a basic duty to provide him "basic human needs" because they ignored Jack's mental health status and failed to provide adequate treatment for his mental or physical health concerns. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not**

---

[51] *Shepherd*, 591 F.3d at 455; *see also Shepherd*, 591 F.3d at 452 (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

[52] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016 citing *Shepherd v. Dallas County*, 591 F.3d at 453-54 (emphasis added).

**enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights.**[53]

B. **DEFENDANTS BEXAR COUNTY, SHERIFF SALAZAR, AND UHS, VIOLATED PLAINTIFF-DECEDENT'S** *FUNDAMENTAL CONSTITUTIONAL RIGHT TO BE PROTECTED FROM CRUEL AND UNUSUAL PUNISHMENT.*

126. The Due Process Clause accords pretrial detainees rights not enjoyed by convicted inmates under the Eighth Amendment to the United States Constitution prohibition against cruel and unusual punishment.[54] A **pretrial detainee is entitled to greater rights** than those afforded convicted prisoners.[55] Specifically, "although convicted prisoners have only an Eighth Amendment right to be free from 'cruel and unusual' punishment, a pretrial detainee has a Fourteenth Amendment Due Process **right to be free from any type of punishment.**"[56] Thus, the inadequate medical care of pretrial detainees falls within the broad scope of reasonable medical care and is actionable under 42 U.S.C.S. § 1983.[57] In *West*, a case involving civil liability under 42 U.S.C. § 1983, the Supreme Court interpreted the Cruel and Unusual Punishment Clause of the Eighth Amendment to impose a duty on prisons to provide medical care for inmates.[58]

127. These elementary principles establish the government's obligation to provide medical care for those persons it is punishing by incarceration.[59] An inmate must rely on prison

---

[53] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added)).
[54] *Colle v. Brazos Cnty.*, 981 F.2d 237, 239 (5th Cir. 1993).
[55] *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (emphasis added).
[56] *Simmons v. Hays Cnty. Sheriff's Dep't*, No. A-11-CV-343-LY, 2012 U.S. Dist. LEXIS 200021, at *20 (W.D. Tex. Sept. 21, 2012); *Colle v. Brazos Cnty.*, 981 F.2d 237, 244 (5th Cir. 1993) ("A pretrial detainee . . . has a **Fourteenth Amendment Due Process right to be free from punishment altogether.**") (emphasis added)).
[57] *Id.*
[58] *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988).
[59] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016.

authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.[60] "In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' *in re Kemmler*, *supra*, the evils of most immediate concern to the drafters of the Amendment."[61] "In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."[62] The infliction of such unnecessary suffering is inconsistent with the standards of decency expressed in modern legislation that "**it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.**"[63]

128. The pain and suffering endured by Plaintiff-Decedent Jack Ule through his incarceration amounted to extremely cruel and unusual punishment prohibited under the Fourteenth Amendment, thus violating 42 U.S.C. § 1983. In the forty-eight hours prior to Jack's death, officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion. Jack's needs were minimized dismissed, and/or ignored. Jack died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.

129. The indifference shown by failing to treat Jack, improperly medicating Jack, and failing to have Jack transferred to a less restrictive environment which could more adequately address his mental health needs is evidence in itself that the level of medical care provided by UHS Correctional Health Care Services was so inadequate that it resulted in a serious deprivation of Plaintiff-Decedent Jack Ule's constitutional human rights and amounted to cruel and unusual

---

[60] *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976).
[61] *Id.* at 290.
[62] *Id.* Cf. *Gregg v. Georgia*, *supra*, at 182-183 (joint opinion).
[63] *Id.* at 290-91 (emphasis added).

punishment prohibited under the Eighth and Fourteenth Amendments.

130. Incredibly, all of the mistreatment and suffering leading to Jack's death began, because he was arrested for trespass by the same hospital entity, which hours prior prematurely had pushed Jack out of the Emergency Department. Jack was nonviolent in all prior encounters with the hospital entity. It is inexplicable that Jack was arrested, rather than escorted off the property, and then, despite his documented mental health history, incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

**C. MULTIPLE FAILURES BY DEFENDANTS BEXAR COUNTY, SHERIFF JAVIER SALAZAR, AND UHS, TO MAINTAIN MINIMUM STANDARDS, ALONG WITH THE EVIDENCE OF INTENTIONAL NONCOMPLIANCE, DEMONSTRATE A PERVASIVE PATTERN AND PRACTICE OF *DERELICTION OF DUTY TO PROTECT AND KEEP DETAINEES SAFE* DURING THEIR INCARCERATION.**

131. Under the conditions-of-confinement prong of the 42 U.S.C. § 1983 claim, Plaintiffs claim the Defendants Bexar County, Sheriff Salazar, and UHS, by and trough their employees and contractors, have a documented pattern and practice of noncompliance, thereby creating *de facto* policies of improperly protecting and caring for inmates with mental health issues putting them at substantial risk of serious harm. Under Tex. Code Crim. Proc. Art. 16.21, "**every sheriff shall keep safely a person committed to his custody**." Had Defendants followed documented policies and procedures under state and local law, Plaintiff-Decedent Jack Ule would have been treated substantially differently, would have received the proper mental and physical care to which he was constitutionally entitled, and likely would not have died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated. But for their lack of compliance, Plaintiff-Decedent Jack Ule likely would be alive today.

132. Incredibly, all of the mistreatment and suffering leading to Jack's death began, because he was arrested for trespass by the same hospital entity, which hours prior prematurely had

pushed Jack out of the Emergency Department. Jack was nonviolent in all prior encounters with the hospital entity. It is inexplicable that Jack was arrested, rather than escorted off the property, and then, despite his documented mental health history, incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

133.     Furthermore, from January 19, 2018 through February 22, 2019, Bexar County Jail had five (5) deaths, one (1) suicide, and four (4) escapes in a twelve (12) month inspection period. *See* Exhibit B. These statistics along with the death of Jack Michael Ule in April 2019, support the claim that Defendants Bexar County and Sheriff Salazar have failed to follow Tex. Code Crim. Proc. Art. 16.21, specifying that "**every sheriff shall keep safely a person committed to his custody**."

134.     In addition, between December 14, 2018 through August 5, 2019, the Bexar County Jail had nine (9) deaths, which further supports the claim that Defendants Bexar County and Sheriff Salazar have failed to follow Tex. Code Crim. Proc. Art. 16.21, specifying that "**every sheriff shall keep safely a person committed to his custody**."

| INMATE DEATHS | |
|---|---|
| Name and Age | Date of Death |
| Enrique Perez, 25 | Aug. 5, 2019 |
| Ashanti Taylor, 19 | Aug. 2, 2019 |
| Leon Causey, 24 | July 18, 2019 |
| Alexander Wise, 29 | May 30, 2019 |
| Jack Ule, 63 | April 8, 2019 |
| Jarnell Kimble, 45 | March 29, 2019 |
| Joshua Miranda, 19 | Jan. 11, 2019 |

| Fernando Macias, 61 | Dec. 16, 2018 |
| Janice Dotson-Stephens, 61 | Dec. 14, 2018 |

Source: Bexar County Sheriff[64]

135.    Statutory violations by Defendants Bexar County, Sheriff Salazar, and UHS, and supporting this claim include but are not limited to:

- Art. 16.21 of the Tex. Code Crim. Proc., "**every sheriff shall keep safely a person committed to his custody**;"

- Art. 16.22 of the Texas Code of Criminal Procedure, for "Early Identification of Defendant Suspected Having Mental Illness or Intellectual Disability" by failing to follow the mandatory procedures for magistration timeframes, prisoner access to mental health professionals, continuity of prescription medication requirements, mandatory training, and reporting requirements for mentally ill defendants ("**Not later than 12 hours after the sheriff or municipal jailer having custody of a defendant … reasonable cause to believe that the defendant has a mental illness or is a person with intellectual disability, the sheriff or municipal jailer shall provide written or electronic notice to the magistrate**." Art. 16.22(a)(3) – magistrate was required to order Dotson to submit to an examination within "**a reasonable period not to exceed 72 hours**");[65]

- Art. 16.23 of the Tex. Code Crim. Proc., "Diversion of Persons Suffering Mental Health Crisis or Substance Abuse Issue" by **failing to make a good faith effort to divert** Plaintiff-Decedent Jack Ule to a proper treatment center in the agency's jurisdiction **as required**;

- Tex. Local Gov't Code § 353.034, "County Jail Facilities" by **failing to provide adequate safety** of Plaintiff-Decedent Jack Ule **nor providing proper supervision and control over the jail** as required under § 351.041;

- Texas Senate Bill 1326 (effective September 1, 2017), "Reporting Requirements" by **failing to follow procedures regarding criminal defendants who are or may be persons with a mental illness or an intellectual disability** and by not obtaining a written assessment ordered by the magistrate and completed by the local MH/IDD authority or another qualified expert; and

- Defendants **failed to meet minimum statutory standards required** by the Texas Commission on Jail Standards and were cited for multiple violations of Tex.

[64] The Rivard Report, "Deaths in Bexar County Jail Raise Questions About Facility's Operations" (Aug. 12, 2019) at https://therivardreport.com/another-death-in-bexar-county-jail-raises-questions-about-jail-operations/ (last visited 12.12.19)
[65] Tex. Code Crim. Proc. Art. 16.22(a)(1) (emphasis added).

Admin. Code, Title 37.

*See* Exhibit C.

136.     As of February 22, 2019, the Bexar County Jail was listed on the Texas Commission on Jail Standards website as having been found in noncompliance with Texas Minimum Jail Standards as codified in the Texas Administrative Code, Title 37, Part 9.  Counties are listed upon verification that the county has received the official notice of noncompliance, and counties are removed immediately upon attaining compliance.  *See* Exhibit D.

137.     Additionally and specifically, the "Annual Report" for calendar year 2018 found **multiple deficiencies** and Defendants were advised to "promptly initiate and complete appropriate corrective measures." These deficiencies included, but were not limited to, findings such as:

- "Inmate classification paperwork and staff interviews indicated that jail staff routinely exceed custody reassessments are required. One file exceeded the 90-day limit by 27 days."[66]
- "The administration has **employed and authorized civilian employees to perform duties of health personnel or trained book in officers which is a violation of minimum jail standards.**"[67]
- "Observation logs indicated that jail staff exceeded the required face-to-face 15-minute observations **on a continual basis** in accordance with the jails [sic] own approved operational plan."[68]
- "Observation logs indicated that jail staff exceeded the required face-to-face 60-minute observations **on a continual basis** by as few as 1 minute up to 126 minutes."[69]
- "The administration has employed and authorized civilian employees to perform duties of licensed jailers. These civilian employees are **not licensed as jailers** by TCOLE as required."[70]
- "The inspection team was unable to verify, through maintained documentation, that recreation is being offered to inmates at least 3 days per week for 1 hours **as**

---

[66] 37 Tex. Admin. Code § 267.1(b)(3).
[67] 37 Tex. Admin. Code § 273.4(a) (emphasis added).
[68] 37 Tex. Admin. Code § 273.5(a)(5)
[69] 37 Tex. Admin. Code § 275.1
[70] 37 Tex. Admin. Code § 275.2 & § 275.7

**required** by minimum jail standards."[71]

*See* Exhibit B.

138.     In sum, the multiple failures (by all named Defendants responsible for the inmates and pretrial detainees at Bexar County Jail) to maintain minimum standards, along with the evidence of intentional noncompliance, demonstrate a **pervasive pattern and practice of dereliction of duty to protect and keep detainees safe during their incarceration**. More disturbing and relevant to the issues in this case is the blatant disregard for the policies and procedures required for mental health by the jail through:

- Lack of training;

- Lack of reassessing inmate classification;

- Employing unlicensed civilian employees over critical screening intake areas; and

- Intentional circumvention of systems by employees to skip areas of required fields in the grievance tracking system.

*See* Exhibit B.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### COUNT III - UNCONSTITUTIONAL EPISODIC ACTS AND OMISSIONS PURSUANT TO 42 U.S.C. § 1983 AS TO ALL DEFENDANTS

139.     Plaintiffs' reincorporate preceding paragraphs 1-91 as if stated fully herein.

140.     An episodic-acts-or-omissions claim, in contrast to a "conditions-of-confinement" claim, faults specific officials for their acts or omissions.[72] Here, because the named Defendants, Bexar County and UHS and Sheriff Salazar, **acted with deliberate indifference and because**

---

[71] 37 Tex. Admin. Code § 285.1

[72] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at * 4 (discussing *Estate of Henson v. Wichita Cnty.*, Tex., 795 F.3d 456, 462 (5th Cir. 2015)).

**there was a pattern and practice of indifference** to Plaintiff-Decedent JACK ULE' constitutional rights, **the Defendant entities are also liable for the § 1983** violations.[73] According to this Court, the relevant question for a viable episodic-acts-and-omissions claim is "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge."[74] Further, to restate the Fifth Circuit's explanation of deliberate indifference, "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[75]

141.    When an official has "subjective knowledge of a substantial risk of serious harm" to the detainee and responds to that risk with deliberate indifference, a pretrial detainee's constitutional rights are violated.[76] This Court stated in *Rodriguez*, "[i]n other words, the official must know of and disregard an excessive risk to inmate health or safety."[77] **The multiple *per se* violations of Texas statutes as well as multiple examples of noncompliance with department and agency guidelines, demonstrate that individually named Defendants knew of the substantial risk of serious harm** to Plaintiff-Decedent Jack Ule, and likely other similarly situated detainees, and **chose to disregard that risk**, whether intentionally or through gross negligence.

142.    Here, Defendant Sheriff Salazar violated multiple "General Duties" required under § 511.009 of the Texas Government Code, examples include failing to "report to the Texas Correctional Office on Offenders with Medical or Mental Impairments on a jail's compliance with Article 16.22, Code of Criminal Procedure,"[78] and failing to ensure the jail adopted "reasonable

---

[73] *See Id*. (discussing *Sanchez v. Young Cnty*., Tex., 866 F.3d 274, 279 (5th Cir. 2017)) (emphasis added).

[74] *Id.* (discussing *Estate of Henson v. Wichita Cnty*., Tex., 795 F.3d 456, 462 (5th Cir. 2015)) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996)).

[75] *Rhyne v. Henderson Cnty*., 973 F.2d 386, 392 (5th Cir. 1992).

[76] *See Id*. (discussing *Estate of Henson*, 795 F.3d at 463).

[77] *Id*.

[78] 4 Tex. Gov't Code § 511.09(a)(17)

rules and procedures to ensure the safety of prisoners."[79] The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights**.[80]

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT IV – DISCRIMINATION BY DEFENDANTS BEXAR COUNTY AND UHS UNDER THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT

143.     Plaintiffs' reincorporate preceding paragraphs 1-91 as if stated fully herein.

144.     The Americans with Disabilities Act ("ADA") defines psychiatric disability as a "mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of impairment; or being regarded as having such an impairment.[81]  Both the ADA and the Rehabilitation Act require public entities—or private entities receiving federal funding—to provide reasonable accommodations to assist disabled person in accessing public programs and services.[82] "Although units of local governments, such as cities and counties, are "state actors" for purposes of Federal Constitution's Fourteenth Amendment, Constitution's Eleventh Amendment does not extend its state immunity from suit by private individuals in federal court to units of local government; these entities are subject to private claims for damages under Americans with Disabilities Act (42 USCS § 12101 et seq.) without Congress' ever having to rely on § 5 of Fourteenth Amendment to render them so."[83]

---

[79] 4 Tex. Gov't Code § 511.09(a)(23)(A)

[80] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) (citing *Leathimman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added)).

[81] 42 U.S.C. § 12102(2) (1994).

[82] *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2014 U.S. Dist. LEXIS 140321, at *20 (N.D. Tex. Sept. 29, 2014) discussing 42 U.S.C. § 12112(b)(5)(A); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011).

[83] *Board of Trustees v. Garrett*, 531 U.S. 356, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001).

145.    Here, Defendants Bexar and UHS qualify as entities that must abide by the ADA and Rehabilitation Act and were required to reasonably accommodate Plaintiff-Decedent Jack Ule due to him known mental disability, specifically, bipolar disorder and schizophrenia.  In the forty-eight hours prior to his death, officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion.  Jack's needs were minimized dismissed, and/or ignored.  Jack died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.  Defendants' treatment of Jack is consistent with Congress' finding that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."[84]

146.    "Establishing a prima facie case of discrimination under the ADA requires the plaintiff to prove (1) that he is a qualified individual under the ADA/Rehabilitation Act; (2) that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability."[85]

147.    The first prong of the test is easily met because (1) Plaintiff-Decedent Jack Ule received Social Security Disability Benefits for his mental condition and UHS repeatedly documented Jack's mental illness diagnoses; therefore, it was well-known and easily identifiable that he was a qualified individual on that basis alone. Alternatively, Jack clearly was "regarded as disabled" based upon UHS' documentation stating that Jack had mental illnesses and the medical

---

[84] 42 U.S.C. § 12102(a)(2) (1994).
[85] *Id.* (discussing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

care provided to Jack, such as the administration of antipsychotic drugs.

148.    The second prong of the test is equally clear in that, "(2) prison _medical_ care is a program or service for which a public entity is responsible."[86]

149.    Although there is disagreement among the circuit courts as to the whether courts should use the definition of _intentional discrimination_ or _deliberate indifference_ standard to interpret the third prong of the test, the Fifth Circuit has "made it clear that a defendant's failure to make reasonable accommodations to the needs of disabled persons can constitute intentional discrimination under the ADA and the Rehabilitation Act.[87] ADA claims have been extended to the prison context, where "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against [a] prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."[88] Irrespective of which standard the Court chooses to apply, Defendants Bexar and UHS discriminated against Plaintiff-Decedent Jack Ule because of his inability to pay bail to be released in conjunction with him mental illness disability that lead to him death.

150.    The facts and claims alleged herein support the claims for intentional discrimination by Defendants Bexar County and UHS under the ADA and Rehabilitation Act because Plaintiff-Decedent Jack Ule suffered more pain and punishment than a non-disabled pretrial detainee.[89]

---

[86] _Borum v. Swisher Cnty._, 2014 U.S. Dist. LEXIS 140321, at *21.

[87] _Id._ at *24 (discussing _Melton v. Dall. Area Rapid Transit_, 391 F.3d 669, 672 (5th Cir. 2004)). _See also Tennessee v. Lane,_ 541 U.S. 509, 531, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004) (noting that Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion").

[88] _Borum v. Swisher Cnty._, 2014 U.S. Dist. LEXIS 140321 at *25 (discussing _McCoy v. Tex. Dep't of Criminal Justice_, C.A. No. C-05-370, 2006 U.S. Dist. LEXIS 55403, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006)).

[89] _See McCoy v. Tex. Dep't of Criminal Justice,_ No. C-05-370, 2006 U.S. Dist. LEXIS 55403 at *7 (S.D. Tex. Aug. 6, 2006).  _See also Wright v. Tex. Dep't of Criminal Justice_, 2013 U.S. Dist. LEXIS 176222, 2013 WL 6578994, at *4-5 (N.D. Tex. Dec. 16, 2013) (denying defendant's Rule

The most egregious examples of him suffering at the hands of Defendants, in violation of both Acts, the fact that in the forty-eight hours prior to his death, officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion, yet Jack's needs were minimized, dismissed, and/or ignored. As a result, Jack died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.

151. Incredibly, all of the mistreatment and suffering leading to Jack's death began, because he was arrested for trespass by the same hospital entity, which hours prior prematurely had pushed Jack out of the Emergency Department. Jack was nonviolent in all prior encounters with the hospital entity. It is inexplicable that Jack was arrested, rather than escorted off the property, and then, despite his documented mental health history, incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

### REQUEST FOR DISCOVERY PRIOR TO GRANTING POTENTIAL 12(B)(6) OR 12(C) MOTIONS

152. Because of the limited evidence available to Plaintiffs at this time, Plaintiffs respectfully request that the Court withhold any 12(b)(6) or 12(c) rulings until Plaintiffs have had an opportunity to conference with Defendants and receive at least limited discovery to determine the identities of the "Unknown/Unnamed" Employees/Officers liable for the numerous failures that led to the unconstitutional violations against Plaintiff-Decedent Jack Ule.

WHEREFORE Plaintiffs pray for relief as set forth below.

---

12(b)(6) motion to dismiss on plaintiff's ADA claims where plaintiff alleged facts sufficient to plead intentional discrimination—specifically, defendant's failure to provide reasonable accommodations to a suicidal prisoner who later killed himself).

## PLAINTIFFS' PRAYER FOR RELIEF

153.     Defendants are jointly and severally liable for the wrongs complained herein, either by virtue of direct participation, acting in concert, or by virtue of encouraging, aiding, abetting, committing, and or ratifying and condoning the commission of the above described acts and/or omissions.

154.     Plaintiff and Plaintiff-Decedent Jack Ule suffered compensatory, special, and punitive damages and are entitled to the maximum amounts allowed by law for the following:

     a.   extreme mental anguish and emotional distress as a result of being held in indefinitely in custody without proper medical and mental health treatment;

     b.   violation of Plaintiff-Decedent Jack Ule's civil rights by Defendants; and

     c.   punitive damages for Defendants' egregious acts and omissions.

155.     Additionally, as the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff and were the moving force of the wrongful death of Plaintiff-Decedent Jack Ule. Plaintiff asserts claims under 42 U.S.C. § 1983 and the wrongful death and survival statutes as specifically pled herein.

156.     Further, Plaintiff Joe Ule in his capacity as heir-at-law to the Estate of Jack Ule, decedent, asserts a survival claim on behalf of the Estate, which has incurred damages including, but not limited to, the following:

     a.   past physical pain and suffering;

     b.   past mental anguish;

     c.   loss of services;

     d.   funeral and/or burial expenses; and

e.  attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as allowed by law.

157.   Plaintiff Joe Ule, in his individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

a.  past and future mental anguish;

b.  past and future loss of companionship, society, services, and affection of Jack Ule; and

c.  attorneys' fees and costs pursuant to 42 U.S.S. § 1988 or as allowed by law.

158.   The Fifth Circuit has held that 42 U.S.C. § 1988 incorporates state law wrongful death and survival remedies under § 1983, thus allowing the surviving relatives of an individual killed as a result of a § 1983 violation to recover for their own injuries arising out of the wrongful death.[90] In denying defendants' motion to dismiss in the *Borum* case, the Northern District Court found that because the wrongful death and survival remedies therein arose from § 1983 rather than from state law, the Texas Tort Claims Act does not operate to immunize Defendant from liability.[91] Likewise, here Plaintiff seeks damages for Plaintiff-Decedent Jack Ule's death in accordance with the wrongful death and survival remedies to fully compensate them for their tragic loss.

159.   Pursuant to 42 U.S.C. § 1988, Plaintiffs request and are entitled to attorney's fees and court costs for litigation of this matter, and all other relief to which plaintiffs are entitled to

---

[90] *See Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390-91 (5th Cir. 1992).

[91] *Borum v. Swisher Cnty.*, U.S. Dist. LEXIS 140321, at *27-28 (discussing *Brown v. Wichita Cnty.*, Tex., CIV.A. 7:05-CV-0108O, 2009 U.S. Dist. LEXIS 68957, 2009 WL 2393821, at *4 (N.D. Tex. Aug. 4, 2009), *aff'd sub nom. Brown v. Bolin*, 500 F. App'x 309 (5th Cir. 2012) ("if a state wrongful death claim is brought in conjunction with a section 1983 action, the county is no longer immune, as any attempt to provide immunity over and above those already provided in section 1983 directly violates federal law")).

under the law.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, JOE ULE, Individually and as the Representative for the Estate of JACK ULE, decedent, respectfully prays that Defendants, BEXAR COUNTY, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, "Unknown/Un-named" Officers/Employees of BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, and BEXAR COUNTY, SHERIFF JAVIER SALAZAR, and "Un-known/Unnamed" Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALAZAR, be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants, jointly and severally, together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of the court; and such other and further relief to which Plaintiffs may be entitled at law or in equity.

## JURY TRIAL DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.

Dated: December 17, 2019                    Respectfully submitted,

By: //s// Leslie Sachanowicz
      Leslie Sachanowicz, Esq.
      Texas Bar No. 17503200
      101 Stumberg
      San Antonio, TX 78204
      Email: les.law@hotmail.com
      Tel. (210) 883-8565