UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JOE ULE, INDIVIDUALLY AND AS
THE REPRESENTATIVE FOR THE
ESTATE OF JACK ULE, DECEDENT,

        Plaintiff,

v.                                                    No. SA-19-CV-01459-JKP-ESC

BEXAR COUNTY HOSPITAL
DISTRICT, BEXAR COUNTY, SHERIFF
JAVIER SALAZAR,

        Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has under consideration *Defendant Bexar County Hospital District d/b/a University Health System's Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*. ECF No. 14. Plaintiff[1] filed a response in opposition, *see* ECF No. 16, and Defendant filed a reply, *see* ECF No. 18. The motion is ripe for ruling. For the reasons that follow, the Court denies the motion.

## BACKGROUND

Accepted as true, Plaintiff's complaint alleges the following factual allegations.[2] Plaintiff Joe Ule is Jack Ule's surviving brother. Jack Ule ("Jack") died on April 18, 2019, while incarcerated as a pretrial detainee in the Bexar County Jail.[3] At the time of his death, Jack was sixty-three years of age. He had previously been diagnosed with schizophrenia, atrial fibrillation,

---

[1] Plaintiff Joe Ule brings this case in dual roles: individually and on behalf of his brother's estate.

[2] When conducting a Fed. R. Civ. P. 12(b)(6) analysis, a court must accept all of the factual allegations in the complaint as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

[3] The parties used Bexar County Jail and Bexar County Adult Detention Center interchangeably. Unless quoted, the Court uses the term "Bexar County Jail" or the "Jail."

hypertension, and an elevated "QTC." Jack's death was the result of "hypertrophic and dilated cardiomyopathy," or an enlarged heart leading to heart failure. The events leading to Jack's death, as relevant to Bexar County Hospital District d/b/a University Health System ("UHS"), are as follows.

Jack's history of mental illness began in his late twenties. In the year 2000, he was no longer able to work due to his mental illness. In 2015, after caring for his mother until her death, Jack moved to Texas. Unable to work, Jack did not have health insurance and was homeless. In February 2019, Jack sought health care at UHS, where he was seen by health care providers at least eight times before he was arrested at the hospital on April 4, 2019.

At his first visit to UHS on February 7, 2919, Jack was diagnosed with "Chronic Mental Illness" and described as "uninsured," ""overweight," and "homeless." Clinical observations included "a new onset of Atrial Flutter with frequent falls, tachycardia, fatigue on exertion, and swelling in lower extremities." No diagnostic tests were ordered and Jack was discharged that day.

On February 19, 2019, Jack was seen again at UHS. During his visit he refused medical care. Thus, he was advised he would be discharged. Jack refused to leave. Medical staff summoned UHS police who offered Jack clothes and a bus pass. Jack accepted the items, dressed, and was escorted out of the hospital. Police twice made contact with Jack while he was waiting for emergent care on February 22, 2019. The first contact was made after a nurse reported that Jack was "touching/scratching himself, in public, and in a manner that others at this facility may find inappropriate and/or offensive." The second contact was made after the cafeteria supervisor lodged a similar complaint. When police arrive, Jack was sleeping. On

March 13, 2019, police again escorted Jack from the cafeteria to the emergency waiting area. This time Jack had been observed "talking to himself and loitering."

On or about March 18, 2019, Jack was seen by UHS medical personnel. After a three-minute visit with Jack, a physician assistant charted the following notations: (1) " . . . patient has been seen here multiple times for the same complaint" and (2) " . . . patient has been medically screened within the limited time and resources available to do so and it has been determined that no clinically apparent life [or] limb threatening condition currently exists." The doctor who saw Jack that day noted in the history of present illness section: "reports BLE swelling, but states, 'this is because I always lay down flat.' Of note, patient states that he does not take medication at home 'because I do not need them.' States that 'I do not take Lasix at home because it would not be effective.'" The doctor also found that Jack had the capacity to make medical decisions. Jack returned to UHS on March 19, 2020 and was cited for criminal trespass.

UHS admitted Jack on March 21, 2019 "for hypervolemia due to acute heart failure exacerbation." Jack remained hospitalized until March 28, 2019, when he again was escorted out by police because he would not allow medical staff to remove the IV from his arm, complained about not having shoes, and said that he was not leaving without shoes. UHS provided disposable foot covers as a resolution for his complaint. On April 3, 2019, Jack returned to UHS complaining of chest pain and shortness of breath. UHS performed a chest x-ray, which showed "cardiomegaly, pulmonary vascular congestion, and interstitial pulmonary edema." This was a change from an x-ray taken on March 21, 2019, which showed Jack's pulmonary vasculature was within normal limits and no cardiomegaly was identified. UHS also performed an electrocardiogram which showed left atrial enlargement and a "long QT." Jack was discharged shortly thereafter.

On April 4, 2019, Jack was arrested after he was found watching television in an unoccupied waiting area. It was shortly after midnight, so there was no one around and Jack was not bothering anyone. Jack told the officer that he had just been discharged from the emergency center but wanted to rest and watch television before leaving. The officer told Jack that watching television and loitering at the hospital were not permitted. The officer then detained Jack and escorted him to the "Behavioral Detainee Side" of the UHS facility. After reviewing Jack's history in the UHS database, the officer placed Jack in handcuffs and transported him to jail to be booked for misdemeanor criminal trespassing.

Jack was processed and jailed at the Bexar County Jail by an "unknown" jail administrator. Later that morning, Jack submitted to medical screening and mental health assessments. During the mental health assessment, Jack admitted to being hospitalized multiple times for mental illness related issues and also admitted to taking the antipsychotic Olanzapine at one point in his life. Jack also was described during the mental health assessment as being delusional.

UHS provides medical services to Bexar County Jail including staffing, on-site services, clinic, pharmacy, and in-patient care. On April 5, 2019, UHS prescribed to Jack, then a Jail inmate, a daily dose of Olanzapine. Four days later Jack was observed as manic, irritable, and as having trouble getting to sleep. On April 9, 2019, a UHS employee permitted Jack to sign a refusal of medical services. At that time, Jack had received two nonconsecutive doses of Olanzapine.

On April 17, 2019, at 6:31 a.m., a "Code 1 (Medical Emergency)" was called because Jack was experiencing shortness of breath ("SOB"). Jack was seen by an LVN who dismissed Jack's complaint, noting Jack's vital signs were "within normal limits" and that Jack had

4

regularly complained of SOB "over the past 2 months." The LVN put in a "plan for Mental Health" and had Jack returned to the pod. At 8:30 p.m., 9:00 p.m., and 11:30 p.m., Bexar County correctional officers requested medical attention for Jack. The officers relayed that Jack was requesting medical attention and was defecating and urinating on himself. The LVN deemed the requests "not a medical emergency" and dismissed the incontinence as "behavioral." At 12:30 a.m. on April 18, 2019, after an officer again expressed concern for Jack, the LVN decided to assess Jack's status. Upon assessing Jack, the LVN determined that Jack was exhibiting "detention" issues, which were the purview of the officers. Jack died at 8:40 that morning.

In December 2019, Plaintiff commenced this civil action asserting claims against Bexar County and Sheriff Salazar under 42 U.S.C. § 1983 and the Texas Constitution and against Bexar County under the Americans with Disabilities and Rehabilitation Acts. *See* Pl.'s Orig. Compl. (ECF No. 4) at 26-49. Plaintiff's complaint also names as defendant Bexar County Hospital District d/b/a/ University Health Systems ("UHS"), a political subdivision of the State of Texas. *Id.* at 1. Plaintiff's claims arise from medical treatment Jack received from UHS between February 7, 2019 and April 18, 2019; from Jack's arrest by a hospital district police officer on April 4, 2019; his two-week confinement at the Bexar County Jail between April 4, 2019 and April 18, 2019; and his death on April 18, 2019. ECF No. 13 at 1.

Plaintiff specifically asserts that UHS subjected Jack to unconstitutional conditions of confinement when it provided constitutionally inadequate medical care, *id.*, pars. 115-138, and the UHS violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act when it failed to extend reasonable accommodations to Jack as a disabled prisoner and discriminated against him based on his disability. *Id.*, pars. 144-150. UHS moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

5

## LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that asserts a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). Furthermore, when ruling on a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor." *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Nevertheless, plaintiffs must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Facts alleged by the plaintiff must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

> misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). As *Twombly* states, to avoid dismissal under Rule 12(b)(6), plaintiffs must allege facts that "nudge" an asserted claim "across the line from conceivable to plausible." 550 U.S. at 570. The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted claims. *Id.* at 563 n.8.

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks omitted). "[T]here can be no § 1983 liability unless the plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc). Accordingly, for a § 1983 claim to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the plaintiff must allege that (1) a state actor, i.e., a person or entity acting under color of state law, (2) deprived the plaintiff of a federal constitutional right." *Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2017 WL 3046881, at *11 (N.D. Tex. May 25, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 3034317 (N.D. Tex. July 17, 2017); *accord Calhoun v. Mejia*, No. A-08-CA-135-SS, 2008 WL 11411254, at *3 (W.D. Tex. May 20, 2008) (quoting § 1983).

## DISCUSSION

Plaintiff's complaint brings claims under four separate counts. Counts II, III, and IV name Defendant UHS.

## I. Counts II and III: Inadequate Medical Care

Plaintiff alleges in two separate counts that UHS violated Jack's right to adequate medical care under the Fourteenth Amendment. Count II asserts the claim pursuant to a "conditions of confinement" legal theory. ECF No. 4, pars. 115-138. Count III asserts the claim pursuant to a "episodic act or omission" legal theory. *Id.*, pars. 139-142.

A conditions of confinement claim is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc); *see also Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015). A conditions of confinement claim capable of surviving a motion to dismiss alleges: (1) "a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [the inmate's] constitutional rights. *Duvall v. Dall. Cty. Tex.*, 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645).

A condition may be expressed by an explicit policy or an unstated or *de facto* policy. Explicit policies include revocations of or restrictions on privileges, disciplinary segregation, overcrowding, length of pre-trial detention, or refusing access to drugs for rehabilitation. *See Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir. 1997) (en banc) (listing cases deemed to be conditions of confinement cases). An unstated or *de facto* policy, may be evidenced by a pattern of acts or omissions "sufficiently extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Hare*, 74 F.3d at 645. A *de facto* policy may be demonstrated through evidence such as commissioned reports, consistent employee testimony, and "other documentary evidence indicating inmates received 'grossly inadequate' treatment." *Montano*, 842 F.3d at 875. A constitutional violation is alleged where the facts show that "the condition of

8

confinement is not reasonably related to a legitimate, non-punitive governmental objective." *Scott*, 114 F.3d at 53.

A plausibly alleged episodic act or omission claim alleges facts that show: "(1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020). A claim for deliberate indifference to a serious medical need must plausibly allege that a specific defendant was deliberately indifferent to his serious medical needs. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). An allegation of deliberate indifference must show (1) the plaintiff's "exposure to a substantial risk of serious harm" and (2) the official's "deliberate indifference to that risk," such as the intentional denial, delay, or interference with a plaintiff's medical care, or conduct that evinces a wanton disregard. *Gobert*, 463 F.3d at 345-46; *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *see also Estelle*, 429 U.S. at 104-05. Thus, an inadvertent failure to provide adequate medical care, negligence, a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, are all insufficient to constitute deliberate indifference. *See Estelle*, 429 U.S. at 105-07. Deliberate indifference requires a showing that officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino v. Tex. Dep't. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

Plaintiff alleges that "in the forty-eight hours prior to his death officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion." ECF No. 4, par. 123. According to Plaintiff, UHS was aware of Jack's medical and mental health history given Jack's many visits to the hospital between February 7, 2019 and his arrest on April 4, 2019. *Id.*, pars. 24-50. Even though in the months preceding his arrest seven physicians found Jack lacked the capacity to refuse treatment, *id.*, par. 72, UHS allowed Jack to refuse medical services at the jail. *Id.*, par. 71. Even though the Jail's correctional officers expressed to UHS staff their worry for Jack's safety, their concerns about Jack's health and behavior, and "repeatedly notified the nurse that there were concerns about Jack," *id.*, pars. 79, 145, the LVN spent only seven minutes assessing Jack and refused to see him in the critical hours before his death, ignoring the officers' repeated requests for Jack to receive medical attention. *Id.*, par. 75. When the LVN did agree to assess Jack's status, Jack's responses were "nonsensical." *Id.*, par. 80. Nonetheless, the LVN decided whatever was going on with Jack was a "detention issue" to be dealt with by the Jail's correctional officers. *Id.*, pars. 80-82.

UHS argues that Plaintiff's "bare assertion" that Jack received inadequate care is insufficient to state an inadequate medical care claim under a conditions of confinement theory nor are the allegations sufficient to support a claim under an episodic act or omission theory. ECF No. 14, pars. 10-11. UHS contends the allegations at most allege negligence. Particularly because the complaint does not make clear "if [the complaint is] referring to UHS medical or mental health staff, physicians, or Bexar County employees": the complaint alleges no facts "to establish how UHS failed to appropriately 'provide adequate treatment'"; and the complaint does

not explain what is meant by "adequate treatment or the type of treatment that was needed." *Id.*, par. 12.

Plaintiff's allegations that UHS was responsible for the medical care of pretrial detainees at the Bexar County Jail, that it knew Jack's medical and mental health history, and that it refused treatment to Jack in the final hours of his life, even though jail personnel repeatedly requested medical aid for Jack, allege a plausible claim for inadequate medical care. These allegations do not evince inadvertence, negligence, or a mere delay but, if true, show that a UHS employee refused to treat Jack, disregarded his complaints, and ignored the pleas of the corrections officers to help Jack. *Domino*, 239 F.3d 756. Thus, Plaintiff stated "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Twombly*, 550 U.S. at 570.

## II. Count IV: Americans with Disabilities and Rehabilitation Acts

Plaintiff alleges that UHS "officers repeatedly notified the nurse that there were concerns about Jack, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion, yet Jack's needs were minimized, dismissed, and/or ignored" causing Jack to suffer more pain and punishment than a non-disabled pretrial detainee. ECF No. 4, par. 150.

UHS argues that the allegations in the complaint are conclusory because Plaintiff failed to allege any specific facts to support an ADA or Rehabilitation Act claim allegation. Specifically, that Plaintiff does not allege any accommodation which UHS could and should have made but did not. ECF No. 14, par. 14.

> A plaintiff must first establish a prima facie case of discrimination before relief under the ADA can be considered. To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated

against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

The prima facie case of discrimination under the Rehabilitation Act is operationally identical to the test under the ADA, requiring a plaintiff to allege: (1) the existence of a program or activity within the state which receives federal financial assistance; (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) *the plaintiff is a qualified handicapped person, who solely by the reason of her handicap has been excluded from participation in, been denied benefits from, or otherwise has been subject to discrimination under such program or activity*.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72, 676 n.8 (5th Cir. 2004) (emphasis in original) (citations omitted). Prison medical care "is one of the 'services, programs, or activities' covered by the ADA." *Kiman v. New Hampshire Dept. of Corrs.*, 451 F.3d 274, 284 (1st Cir. 2006), *citing United States v. Georgia*, 546 U.S. 151 (2006).

As shown above, Plaintiff adequately alleges facts to show that Jack was disabled by his mental illness, that UHS knew of his disability, and that UHS failed to provide medical care during his incarceration. Thus, at the motion to dismiss stage, Plaintiff has sufficiently alleged a plausible disability discrimination claim. Therefore, Plaintiff's disability discrimination claims shall proceed.

## CONCLUSION

For the reasons set forth above, Defendant Bexar County Hospital District d/b/a University Health System's Motion to Dismiss (ECF No. 14) is DENIED.

It is so ORDERED.

SIGNED this 22nd day of September 2020.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE